Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9297 | **DATE** | 5/3/2004 |
| **CASE TITLE** | Davis vs. Jo Anne Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER. The Court grants plaintiff's motion for summary judgment (14-1) and remands this case to the agency for further proceedings.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | 5-4-04 date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | jj courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES DAVIS, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 02 C 9297 |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Davis claims he is disabled by a condition that results in nocturnal seizures at least three times per week. He filed this action, seeking to reverse and either set aside or remand for a new hearing the Social Security Administration's ("SSA") final administrative decision denying his claim for Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.[1] Plaintiff moves for summary judgment. For the reasons stated in this opinion, Plaintiff's motion is granted and the court remands this matter to the SSA for further proceedings.

**I.    Procedural History**

On April 6, 2000, Plaintiff filed an application with the SSA for Title II DIB and Title XVI SSI benefits, alleging that he has been disabled and unable to work since February 6, 2000 due to his nocturnal seizures. (Record ("R.") 93.) The SSA denied Plaintiff's claim initially and on reconsideration on the ground that, as Plaintiff had the ability to return to his former position as a security guard, he was not disabled. (R. 69, 73-74, 222, 228.) Following a hearing, Administrative Law Judge ("ALJ") Percival Harmon issued a written order dated October 12, 2001, finding that Davis was not disabled under the Social Security Act, as he was "able to perform his past relevant

---

[1]    See 49 Stat. 622, codified as amended at 42 U.S.C. §§ 401 et seq. (Title II); as added, 86 Stat. 1465, and as amended, § 1381 et seq. (Title XVI).



work as either a security guard or as an electrical assembly inspector." (R. 18.) Alternatively, the ALJ determined there were "a significant number of jobs in the national economy that he could perform." (R. 18.) On November 8, 2002, the SSA Appeals Council denied Plaintiff's request for review. (R. 7.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 7.)

## II. Factual Background

### A. Plaintiff's Work And Medical History

Over the years, Plaintiff has worked a variety of jobs, including restaurant worker, PC board assembler and inspector, inspection molding machine operator, security guard, and metal press and forklift operator. (R. 15-16, 29-31, 60, 120-127.) Plaintiff last worked in January 2000 performing "housekeeping or environmental service" for Gundersen Lutheran Hospital in Minnesota. (R. 120, 124.)

On or about January 23, 2000,[2] Plaintiff began experiencing seizures. (R. 147.) On January 30, Plaintiff's girlfriend found him lying on the floor having a seizure,[3] lasting approximately two minutes, which caused Plaintiff to bite his tongue. (R. 209, 212.) Plaintiff's girlfriend took him to the emergency room at the Community Memorial Hospital in Winona, Minnesota, where Plaintiff had another seizure and experienced loss of continence. (R. 212.) A computerized tomography scan of Plaintiff's head showed normal results. (R. 214.) The reporting physician[4] prescribed Dilantin[5] to control Plaintiff's seizures. (R. 209.) Later that day, Plaintiff returned to the emergency

---

[2] The record does not indicate the precise dates of Plaintiff's employment at Gundersen Hospital, nor whether Plaintiff was still working there as of January 23.

[3] The record does not indicate where Plaintiff was at the time of this seizure.

[4] Unless otherwise indicated, the court employs the term "reporting physician" throughout this opinion to identify physicians who completed Plaintiff's patient records found in the record.

[5] The record uses the terms "Dilantin" and "Phenytoin," the active ingredient in
(continued...)

2

room, as his tongue was swollen and he had difficulty swallowing. (R. 206-07.) The reporting physician prescribed Augmentin to prevent infection of his tongue lacerations. (R. 206.)

On February 1, Plaintiff experienced a seizure lasting approximately one minute. He then lost consciousness for several hours and was transported to the emergency room at Cook County Hospital in Chicago. (R. 147.)[6] The reporting physician gave Plaintiff instructions concerning medication and directed him to follow up with the neurology clinic. (R. 148.) Plaintiff did return to Cook County Hospital for a follow-up visit on February 5 to review his Dilantin level. (R. 145-46.)

On March 20, at the Sinai Family Health Centers in Chicago ("Sinai"), Plaintiff reported a stinging pain in his left arm and difficulties with his balance. (R. 164.) The Sinai reporting physician found that Plaintiff had normal coordination, with no motor or neurosensory deficits. (R. 164.) The doctor diagnosed Plaintiff as suffering from an uncontrollable seizure disorder, increased his Dilantin level, and prescribed Phenobarbital to help control his seizures. (R. 164.) On March 31, a Sinai physician warned Plaintiff against driving and noted that he had not filled his Phenobarbital prescription. (R. 163.)

On April 5, a Cook County Hospital physician performed an electroencephalogram ("EEG") of Plaintiff. (R. 183-84.) The physician stated the following:

> Background activity consists of well developed and well organized 9-10 hz waves, bilaterally synchronous and symmetrical[, i]ntermixed [with] 15-20 hz waves.[7] No focal or generalized abnormality was detected[; h]yperventilation produced no abnormalities[; p]hotic stimulation produced no driving[; d]rowsiness showed generalized attenuation and slower frequencies[; and b]rief sleep was characterized

---

[5](...continued)
Dilantin, interchangeably. See http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Overview&DrugName=DILANTIN. For simplicity's sake, the court employs the term "Dilantin" throughout this opinion.

[6] The record does not indicate who brought him to the hospital. The court infers that Plaintiff moved from Minnesota to Chicago on or about January 31.

[7] The "dominant frequency" for brain waves is 8 to 10 hz. DORLAND'S ILLUSTRATED MED. DICTIONARY 535 (28th ed. 1994).

3

by bilaterally synchronous and symmetrical activity.[8] Impression: [n]ormal EEG in wake, drowsiness, and brief sleep.

(R. 184.)

On May 1, Dr. Howley Stevenson of the Southwest Medical Center in Chicago examined Plaintiff and completed an Epilepsy Report for the Bureau of Disability Determination Services of the Illinois Department of Human Services. (R. 141-43.) Dr. Stevenson diagnosed Plaintiff's condition as a seizure disorder and noted that Plaintiff's seizures were nocturnal, occurred three times per month, and typically resulted in loss of consciousness, tonic/clonic movement,[9] and urinary incontinence. (R. 142.) On June 9, Plaintiff told a Sinai reporting physician[10] that he had experienced a seizure on an unspecified date, had failed to take some of his Dilantin, and was having trouble maintaining his balance. (R. 161.) The physician observed that Plaintiff had ataxia.[11] (R. 161.)

On June 21, Dr. Henry Bernet completed a Physical Residual Functional Capacity Assessment of Plaintiff in connection with Plaintiff's application for DIB and SSI benefits. (R. 149-56.) Dr. Bernet reported that Plaintiff could "[o]ccasionally lift and/or carry (including upward pulling)" up to 50 pounds, "[f]requently lift and/or carry (including upward pulling)" up to 25 pounds, "[s]tand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday," "sit

---

[8] The report does not define the terms "bilaterally synchronous and symmetrical activity," "focal or generalized abnormality," or "driving," nor does it indicate whether Plaintiff remained in the hospital overnight following this EEG.

[9] "Tonic" is defined as "marked by prolonged muscular contraction," and "clonic" as relating to "a rapid succession of alternating contractions and partial relaxations of a muscle occurring in some nervous diseases." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1242, 216 (10th ed. 1997).

[10] Plaintiff also visited Sinai on February 9, 14, and 21, and May 11; however, the records of these visits are either illegible or contain no new information regarding his condition. (R. 162, 166-68.)

[11] "Ataxia" is defined as "an inability to coordinate voluntary muscular movements that is symptomatic of some nervous disorders." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 72 (10th ed. 1997).

4

(with normal breaks) for a total of about 6 hours in an 8-hour workday," and "[p]ush and/or pull (including operation of hand and/or foot controls) unlimited." (R. 150.) Dr. Bernet also stated that Plaintiff had no manipulative, visual, or communicative limitations, although he could not climb ladders, ropes, or scaffolds and had to "avoid even moderate exposure" to "hazards (machinery, heights, etc.)." (R. 150-53.)

On July 10, a Sinai physician indicated that Plaintiff had complained of problems with his balance and that he was continuing to experience seizures. (R. 159.) Plaintiff also told the physician that, although his previous seizures had always been preceded by "an aura of numbness" on his left side, he had experienced "no recent episodes" involving such sensation. (R. 159.) Although the Sinai physician found no focal neurological deficits,[12] he diagnosed Plaintiff with mild gingival hyperplasia.[13] (R. 159.) On August 11, Plaintiff reported to a Sinai physician that he had experienced two seizures during July[14] and one during the previous week. (R. 158.) The physician again diagnosed Plaintiff with mild gingival hyperplasia. (R. 158.)

On September 28, Plaintiff went to South Shore Hospital in Chicago complaining of frequent vomiting and loss of balance. (R. 197-98, 201.) Neurological tests, including an evaluation of his motor skills, showed normal results. (R. 199.) Plaintiff's chart indicated that he had not taken any

---

[12] "Focal neurological defect" refers to "a problem in nerve function that affects either[] a specific location . . . [or] a specific function (for example, speech may be affected, but not the ability to write). The problem occurs in the brain or nervous system. It may result in a loss of movement or sensation." See http://www.nlm.nih.gov/medlineplus/ency/article/003191.htm.

[13] According to the U.S. Department of Veterans Affairs, "[g]ingival hyperplasia, or overgrowth of the gingival [gum] tissues, occurs frequently in patients who have undergone prolonged medication therapy for . . . epilepsy or seizure disorders." See http://www.va.gov/hac/champva/policy/cvapmchap2/1c2s5.1.pdf.

[14] The record does not indicate the precise dates. The reporting physician in fact indicated that Plaintiff had experienced "2 seizures last month (June)." (R. 158.) As the report is dated August 11, and as Plaintiff was previously examined on July 10, the court presumes these episodes occurred in July, rather than June.

5

medications recently, (R. 198),[15] and tests showed that his Dilantin level was below the therapeutic range. (R. 188, 191-92.)

## B. Administrative Hearing Testimony of Plaintiff and Vocational Expert

Plaintiff testified that he had stopped working in January 2000 due to his seizures. (R. 30.) During his seizures, which occur about three nights per week[16] and last approximately ten to fifteen minutes, Plaintiff stated, his left hand goes numb, he loses awareness of his surroundings, he loses hearing in both ears, he bites his tongue, and he loses control of his bowels. (R. 38-41, 47, 50.) Ten to fifteen minutes after each episode, Plaintiff indicated, he is "back to [his] regular self or [his] normal self," but normally cannot fall asleep for at least one or two hours and does not sleep well. (R. 38-39, 43.) Plaintiff stated that he experiences two side effects from the Dilantin: he tires quickly even when he is not active, (R. 43), and sometimes he staggers, "like I'm going to trip, or . . . my equilibrium [is] off." (R. 50.)[17]

Plaintiff, a 31-year-old male who started but did not complete the eleventh grade, is single and lives with his parents, nephew, and two nieces. (R. 26-27.) He does not perform any full-time, part-time, or volunteer work. (R. 28-29.) Plaintiff generally spends his days sitting at home on his porch, occasionally watching his two-year-old nephew, watching television, and listening to music. (R. 36-38.) He can perform a variety of tasks without assistance, including dressing and undressing, showering or bathing, eating, and combing his hair. (R. 46.) Apart from sweeping floors, however, Plaintiff performs no household chores. (R. 35-36.) He has not driven since he experienced his first seizure episode and has no hobbies. (R. 36-38.) He does not engage in any social activities apart from conversing with a friend who stops by his home periodically. (R. 36-37.)

---

[15] The record does not indicate whether any of Plaintiff's physicians had previously recommended that he cease taking his medications.

[16] Before he took Dilantin, Plaintiff claims he had three seizures per day. (R. 41.)

[17] When he began taking Dilantin, Plaintiff testified, he experienced dizziness, blurriness, staggering, stumbling, and difficultly walking. (R. 41.)

6

Although Plaintiff had played basketball "when I first came back and . . . thought I was over my seizures," he became "winded" easily and no longer attempts to play. (R. 37-38.) When he stands for more than two hours, he experiences some back pain, and his legs become "wobbly like Jell-O." (R. 49-50.) Plaintiff can walk three or four blocks before tiring but cannot perform any "heavy lifting." (R. 45.) When asked if it "would be a problem" for him to work a day job, Plaintiff responded that he did not believe any employers would be willing "to take a [risk] on somebody who's [prone to seizures]." (R. 52.)

Vocational expert William Schweihs ("Schweihs") characterized Plaintiff's previous work as a forklift operator and metal press operator as semi-skilled and requiring heavy exertion, (R. 15, 59-60); his work as a PC board assembler and inspector as unskilled and sedentary, (R. 60); his previous security work as semi-skilled, with some positions sedentary and others requiring light exertion, (R. 60); and his work as an injection molding machine operator as semi-skilled and involving light to medium exertion. (R. 61.) Schweihs testified that a hypothetical individual matching Plaintiff's vocational profile–a younger individual with a limited education and Plaintiff's past relevant work experience who was precluded from working on ladders, scaffolds, and unprotected heights, and near hazardous moving machinery–could perform "many of the security positions described [and] PC board assembly/inspection." (R. 61-62.) He also stated that if the same hypothetical individual suffered "unpredictable seizures three times a week . . . recurring at night and res[ulting] in losing one hour from any productive activity or work, if one is working," that individual would be precluded from working during the eight-hour period in which he experienced seizures. (R. 62-63.) After asking for and receiving permission to respond to the latter remark, Plaintiff stated, "I just want to tell [the ALJ] that [for] every job that I have [had I have] worked nights, and . . . I[] just like working nights." (R. 63.)

### C. The ALJ's Determination

The Social Security Act defines a "disability" as the "inability to engage in any substantial

7

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) (Title II), 1382c(a)(3)(A) (Title XVI). The SSA has promulgated regulations establishing a five-step sequential evaluation process to determine disability:

(1) Is the claimant currently working at a "substantial gainful activity"?
(2) Does the claimant have a "severe impairment"?
(3) Does the impairment meet or equal one of the impairments listed in Appendix 1?[18]
(4) Can the claimant do his past relevant work?
(5) Can the claimant perform other jobs existing in significant numbers in the national economy?

20 CFR § 404.1520 (2003) (governing claims for DIB); § 416.920 (parallel regulation governing claims for SSI). If at any step the SSA can make a finding of disability or non-disability, the agency will not review the claim further. §§ 404.1520, 416.920. The burden of proof is on the claimant through step four, and only shifts to the Commissioner at step five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (citation omitted). At step three, if the agency determines that the impairment is on the list of impairments found in Appendix 1, the claimant qualifies as disabled, without further inquiry regarding his age, education, or work experience. *Barnhart v. Thomas*, – U.S. –, 124 S. Ct. 376, 379 (2003); §§ 404.1520(d), 416.920(d). At the fourth and fifth steps, the ALJ must assess the claimant's residual functional capacity ("RFC")–work-related activities the claimant can perform despite her limitation, based on all relevant evidence in the record. *Id.*; 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

In this case, at the first two steps in the process, the ALJ found that (1) Plaintiff had not engaged in any substantial employment since February 6, 2000, and (2) Plaintiff's seizure disorder

---

[18] Appendix 1 to Subpart P of 20 C.F.R. § 404 lists 14 categories of impairments that may constitute a disability under the Social Security Act. It also describes how these medical conditions need to be documented in order to be "severe" enough to constitute a "disability."

is "secondary to epilepsy" and is therefore is a severe impairment. At step three of the analysis, the ALJ determined that Plaintiff's impairment "is not severe enough to meet or medically equal one of the impairments listed in Appendix 1 . . . ." (R. 16, 18.) The ALJ did not explain how he reached this determination, however.

The ALJ concluded that Plaintiff was not disabled under step four, as he "is able to perform his past relevant work as either a security guard or as an electrical assembly inspector with consideration that [he] not be scheduled to work during a time in which he is likely to experience a seizure." (R. 18.) The ALJ found that, although Plaintiff "should never climb ladders, ropes, or scaffolding[,] . . . work at unprotected heights or around hazardous machinery[,] . . . drive a motor vehicle[,] or operate moving machinery," he could "occasionally lift/carry fifty pounds and frequently lift/carry twenty-five pounds" and could "sit/stand/walk for at least six hours out of an eight-hour workday." (R. 16.) The ALJ concluded, therefore, that Plaintiff "retains the . . . residual functional capacity to perform a significant range of medium work."[19] (R. 16.) In reaching this conclusion, the ALJ gave "significant weight" to Dr. Bernet's Physical RFC Assessment of Plaintiff. (R. 16, 149-56.) The ALJ also relied on vocational expert Schweihs's opinion that an individual with Plaintiff's vocational profile could perform many of Plaintiff's former security and PC board assembly and inspection jobs, provided such individual does not work during the eight-hour period in which his seizures occur. (R. 17, 62-63.) The ALJ found these opinions to be well-supported by the medical evidence in the record and by Plaintiff's own testimony. (R. 17.) Alternatively, the ALJ found "there are a significant number of jobs in the national economy that [Plaintiff] could perform," given his RFC, age, education, and work experience. (R. 18.)

---

[19] The court presumes "medium work" has the same meaning here as in 20 C.F.R. § 404.1567(c), which states that "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, [the SSA] determine[s] that he or she can also do sedentary and light work."

9

## III. Analysis

### A. Standard Of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court cannot engage in its own analysis of whether Plaintiff is severely impaired as defined by the SSA regulations. *Young*, 362 F.3d at 1001 (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support the conclusion." *Id.* (citation omitted).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

### B. Disability Determination at Step Three

Plaintiff's sole argument in this motion is that the ALJ's determination at step three that his impairment did not meet or equal one of the impairments listed in Appendix 1 was erroneous. Specifically, Plaintiff contends that his impairment meets the definition of "convulsive epilepsy"

under SSA Listing 11.02.[20] (Pl.'s Mem.,[21] at 4.[22]) Defendant contends that the ALJ correctly determined that Plaintiff had not met his burden at step three, as Plaintiff's impairment does not meet two of the criteria in Listing 11.02. (Def.'s Mem.,[23] at 10.)[24] In support, Defendant notes several circumstances not relied on by the ALJ at step three. First, Defendant implicitly argues that Plaintiff has failed to satisfy the requirement that Plaintiff have undergone "at least 3 months of prescribed treatment." (Id.) Specifically, Defendant notes that (1) as of March 31, 2000, Plaintiff had not filled his Phenobarbital prescription, (2) on June 9, 2000, Plaintiff reported that he had failed to take some of his Dilantin, and (3) Plaintiff's September 28, 2000 chart indicated that he had not taken any medications recently,[25] and tests showed that his Dilantin level was below the therapeutic range. (Id. (citing R. 161, 163, 188, 191-92, 198).) Second, Defendant claims that

---

[20] Listing 11.02 provides:

Epilepsy—convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment. With:
    A. Daytime episodes (loss of consciousness and convulsive seizures) or
    B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02.

[21] Memorandum in Support of Plaintiff's Motion for Summary Judgment.

[22] As Plaintiff's brief is not paginated, the court refers to the page captioned "MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION [FOR] SUMMARY JUDGMENT" as page one and sequentially numbers the subsequent pages.

[23] Commissioner's Response to Plaintiff's Motion for Summary Judgment and Memorandum in Support.

[24] Defendant also contends that Plaintiff has failed to meet his burden because his "seizures have not been documented by EEG," a requirement of Listing 11.02 as of October 12, 2001, the date of the ALJ's decision. (Def.'s Mem., at 10.) As discussed below, however, in the court's view, this argument fails for both factual and legal reasons.

[25] As noted earlier, however, the record does not indicate whether any of Plaintiff's physicians had previously recommended that he cease taking his medications.

11

Plaintiff cannot satisfy the requirement that he "manifest[] residuals which interfere significantly with activity during the day." (*Id.*) Specifically, Defendant points out that (1) Plaintiff can watch television, listen to music, and occasionally look after his two-year-old nephew; (2) Plaintiff only staggers or feels off balance "sometimes," (3) on March 20, a Sinai physician found that Plaintiff had normal coordination with no motor or neurosensory deficits, and (4) on July 10, a Sinai physician found no focal neurological deficits. (*Id.* at 10-11 (citing R. 36-38, 50, 159, 164).) Whatever merit these observations may have, they were not mentioned by the ALJ, who offered no analysis at step three, requiring that this case be remanded. See *Steele*, 290 F.3d at 941 ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine [the court's] review to the reasons supplied by the ALJ.")

As noted earlier, at step two of the evaluation process, the ALJ found that Plaintiff's seizure disorder is "secondary to epilepsy" and is therefore a severe impairment. (R. 18.) Without explanation or analysis, however, the ALJ determined at step three that Plaintiff's impairment "is not severe enough to meet or medically equal one of the impairments listed in Appendix 1 . . . ." (R. 16.) In *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003), a minor who suffered a number of impairments appealed the ALJ's denial of SSI benefits. The ALJ had determined that the plaintiff was not disabled at step three,[26] finding that "[t]he claimant has a combination of severe impairments . . . . However, none of these impairments meet the requirements of an impairment listed in Appendix 1 to subpart P of regulation no. 4." *Id.* at 785. The court found this "extremely brief . . . . conclusion to be devoid of any analysis that would enable meaningful judicial review." *Id.* at 786. First, the court noted, the ALJ's opinion did not mention the specific listings under which it considered the plaintiff's impairments. *Id.* As the court explained, "failure to discuss or even cite

---

[26] Step three of the evaluation process for minors requires a review to determine whether the minor claimant has "an impairment(s) that meets, medically equals, or functionally equals the listings." 20 C.F.R. § 416.924(a).

12

a listing, combined with an otherwise perfunctory analysis, may require a remand." *Id.* (citing *Steele*, 290 F.3d at 940). The "lack of reasoning" in the ALJ's opinion, the court concluded, "prevents us from applying the decision structure undergirding disability determinations to a substantive analysis of [the plaintiff's] impairments." *Id.* (citing *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (finding that the ALJ's failure to reference the listing "has left this court with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing")).

In this case, as in *Brindisi* and *Scott*, the ALJ's opinion fails to discuss or even cite any Listings, or to explain his reasons for concluding that Plaintiff's impairment "is not severe enough to meet or medically equal one of the impairments listed in Appendix 1 . . . ." (R. 16.) Defendant argues that these two cases are distinguishable from the case before this court. According to Defendant, the record contains no "documentation of Plaintiff's seizures by EEG," a requirement of Listing 11.02 as of October 12, 2001, the date of the ALJ's decision. (Def.'s Mem., at 9 & n.5, 12 n.8.) This argument fails for two reasons. First, the record does indicate that Plaintiff underwent an EEG on April 5, 2000. (R. 184.)[27] Second, the SSA itself stated that, "[w]ith respect to claims in which we have made a final decision, and that are pending judicial review in Federal court, we expect that the court's review of the Commissioner's final decision would be made *in accordance with the rules in effect at the time of the final decision.*" 67 Fed. Reg. at 20,023 (emphasis added). As noted earlier, on November 8, 2002, the SSA Appeals Council denied Plaintiff's request for review of the ALJ's decision, stating that the ALJ's decision "stands as the *final decision* of the Commissioner . . . ." (R. 7 (emphasis added).) The court, then, should apply the version of Listing 11.02 in effect at the time of the Commissioner's final decision. *Accord Keys v. Barnhart*, 347 F.3d 990, 992 (7th Cir. 2003) ("When the [Appeals] Council decided not to review

---

[27] Although that EEG showed normal results "in wake, drowsiness, and brief sleep," (R. 184), Plaintiff points out that "no . . . medical professional . . . has opined that that EEG is inconsistent with seizure activity." (Plaintiff's Reply Memorandum, at 2.)

the case, the administrative law judge's decision became final, but it became final then, not earlier"). Effective May 24, 2002, among other amendments to the Listings, the SSA removed the requirement in Listing 11.02 that "an EEG be part of the documentation needed to support the presence of epilepsy." 67 Fed. Reg. 20,018, 20,019. In this case, therefore, an EEG is not required to meet or equal Listing 11.02 for convulsive epilepsy.

As the ALJ's opinion lacks any discussion of, or citation to, any of the Listings, the court cannot conduct a meaningful review of the ALJ's determination that Plaintiff's impairment does not meet or equal any of the listed impairments. The court must remand this case back to the agency for further proceedings. The court therefore grants Plaintiff's summary judgment motion.[28]

## CONCLUSION

For the reasons explained here, the court grants Plaintiff's motion for summary judgment (14-1) and remands this case to the agency for further proceedings.

ENTER:

Dated: May 3, 2004

REBECCA R. PALLMEYER
United States District Judge

---

[28] In arriving at this conclusion about the deficiencies in the ALJ's opinion, the court makes no finding as to the merits of Plaintiff's DIB or SSI claims. *Accord Brindisi*, 315 F.3d at 788.

14